1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

MELANIE R. FRANCIS,

11

Plaintiff,

12

v.

13

MICHAEL J. ASTRUE, Commissioner of
Social Security,

14
15

Defendant.

16

CASE NO.    C07-5018RBL-KLS

REPORT AND
RECOMMENDATION

Noted for January 18, 2008

17
18
19
20
21
22

Plaintiff, Melanie R. Francis, has brought this matter for judicial review of the denial of her
application for supplemental security income ("SSI") benefits.  This matter has been referred to the
undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR
4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After
reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and
Recommendation for the Honorable Ronald B. Leighton's review.

23

FACTUAL AND PROCEDURAL HISTORY

24
25
26

Plaintiff currently is 26 years old.[1] Tr. 58.  She has a general equivalency diploma, some college
education and past work experience as a cashier, dishwasher and home care provider. Tr. 108, 113, 331,
378, 383.

27
28

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On February 22, 1999, plaintiff filed an application for SSI benefits, alleging disability as of July 1, 1998, due to schizophrenia. Tr. 323, 372-73, 377.  Her application was denied initially and on reconsideration. Tr. 337-38, 347, 352.  A hearing was held before an administrative law judge ("ALJ") on November 6, 2000, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 686-712.  After the hearing, plaintiff amended her application to request a closed period of disability from August 13, 1998, until February 29, 2000. Tr. 343.  On December 28, 2000, the ALJ issued a decision, in which he awarded plaintiff that closed period of disability. Tr. 323, 343-46.

Plaintiff filed another request for a hearing, apparently because she was dissatisfied with the ALJ's decision. Tr. 323.  She also filed a second application for SSI benefits on June 19, 2001. Tr. 95, 323.  That application was denied initially and on reconsideration. Tr. 58, 60-61, 67.  A second hearing was held on September 29, 2003, before a different ALJ, at which plaintiff, again represented by counsel, appeared and testified, as did another vocational expert. Tr. 713-35.  On February 18, 2004, that ALJ issued a decision, in which plaintiff again was determined to be not disabled on the basis that she was capable of adjusting to work existing in significant numbers in the national economy. Tr. 17-24.

On October 28, 2004, the Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 6.  Plaintiff then filed a complaint in this Court seeking judicial review of that decision, and on May 10, 2005, upon the stipulated agreement of the parties, the Court remanded this matter back to the Commissioner for further administrative proceedings. Tr. 496-98.  The Appeals Council in turn remanded the matter back to the second ALJ. Tr. 499-501.  On June 12, 2006, a third hearing was held before that ALJ, at which plaintiff, represented by counsel, appeared and testified, as did a third different vocational expert. Tr. 736-57.

On September 29, 2006, the ALJ issued a decision, again determining plaintiff to be not disabled, finding specifically in relevant part:

> (1)   at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;
>
> (2)   at step two, plaintiff had "severe" impairments consisting of the following: a psychotic disorder not otherwise specified, rule out schizophrenia; a substance

_____

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

1    abuse disorder in full sustained remission; residual problems from a remote
2    motor vehicle accident, including a left hip injury and multiple fractures; and
obesity;

3    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any
4    of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5    (4)    at step four, plaintiff had the residual functional capacity to perform a modified
range of light work, which precluded her from performing her past relevant
work; and

6    (5)    at step five, plaintiff was capable of performing other jobs existing in significant
7    numbers in the national economy.

8    Tr. 323-333. On November 20, 2006, the Appeals Council declined to assume jurisdiction of the case. Tr.

9    307. The ALJ's decision therefore became the Commissioner's final decision after sixty days. 20 C.F.R.§

10    416.1484.

11    On January 11, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision.

12    (Dkt. #1-#3). Specifically, plaintiff argues that decision should be reversed and remanded for an award of

13    benefits or, in the alternative, for further administrative proceedings for the following reasons:

14    (a)    the Appeals Council erred in failing to review, properly consider and include in
15    the record new evidence submitted to it;

16    (b)    the ALJ erred in failing to consider all of plaintiff's severe impairments;

17    (c)    the ALJ erred in finding plaintiff's mental impairments did not meet or equal
the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03;

18    (d)    the ALJ erred in failing to give appropriate weight to plaintiff's treating and
19    examining medical sources;

20    (e)    the ALJ erred in assessing plaintiff's credibility;

21    (f)    the ALJ erred in assessing plaintiff's residual functional capacity; and

22    (g)    the ALJ erred in finding plaintiff capable of performing other work existing in
significant numbers in the national economy.

23    The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set

24    forth below, recommends that while the ALJ's decision should be reversed, this matter should be

25    remanded to the Commissioner for further administrative proceedings. Although plaintiff requests oral

26    argument in this matter, the undersigned finds such argument to be unnecessary here.

27    <u>DISCUSSION</u>

28    This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

1  Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole

2  to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

3  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

4  v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

5  a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

6  1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

7  one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749

8  F.2d 577, 579 (9th Cir. 1984).

9  I.      Evidence Submitted to the Appeals Council

10         A.      The Additional Documents Faxed on November 15, 2006

11         Plaintiff has provided the Court with a packet of documents, which she asserts plaintiff's counsel

12  faxed to the Appeals Council on November 15, 2006 (see Dkt. #12, Appendix).  Plaintiff further asserts

13  documentation contained in that packet shows she recently had experienced a decompensation.  She claims

14  the Appeals Council did not review that evidence and failed to include it in the administrative record.  That

15  failure, plaintiff argues, violates both the Commissioner's own regulations and her procedural due process

16  rights, which requires reversal of the ALJ's decision.  The undersigned agrees the Appeals Council erred

17  in failing to consider this evidence, but disagrees that such error rises to the level of a constitutional

18  violation.  The undersigned also finds that remand to the Commissioner to consider and make an initial

19  determination regarding that evidence is the proper remedy here.

20         The facsimile cover sheet and transmission report plaintiff provides indicates plaintiff's counsel did

21  fax a total of 27 pages of documents to the Appeals Council on November 15, 2006. (Dkt. #12, Appendix).

22  The Appeals Council, however, does not mention having received any of those documents in its November

23  20, 2006 decision, or having reviewed them prior to making its determination. Tr. 307-310.  Nevertheless,

24  defendant does not contest the claim that plaintiff's counsel faxed those documents to the Appeals

25  Council.  In addition, while defendant states that plaintiff "apparently tried, somewhat unsuccessfully" to

26  submit the documents to the Appeals Council, no argument or showing has been made that they were not

27  received by the Appeals Council.  The undersigned, therefore, shall assume that the Appeals Council

28  received the faxed documents, but failed to discuss them in its decision.

1    Pursuant to the Commissioner's regulations, the Appeals Council shall consider "new and material

2    evidence" submitted to it, but only where such evidence "relates to the period on or before the date of the

3    administrative law judge hearing decision." 20 C.F.R. § 416.1470(b); see also 20 C.F.R. 416.1476(b) and

4    20 C.F.R. 416.1479.  The Appeals Council also "[s]hall evaluate the entire record including the new and

5    material evidence submitted if it relates to the period on or before the date of the administrative law judge

6    hearing decision," and "then review the case if it finds that the administrative law judge's action, findings,

7    or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 416.1470(b).  For

8    the purposes of 20 C.F.R. § 416.1470(b), evidence is "new" if it is "more than merely cumulative of other

9    evidence in the record." Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 1999) (analyzing 20 C.F.R. §

10   404.970(b), the analogous regulation governing disability insurance benefits cases); see also Hangartner v.

11   Shalala, 865 F.Supp. 755, 759 (D.Utah 1994).

12   Evidence is "material" if it is "relevant to the claimant's condition for the time period for which

13   benefits were denied." Bergmmann, 207 F.3d at 1069-70 (additional evidence must not merely detail after-

14   acquired conditions or post-decision deterioration of pre-existing condition); see also Williams v. Sullivan,

15   905 F.2d 214, 216 (8th Cir. 1990) (evidence obtained after ALJ decision is material if it relates to

16   condition on or before date of ALJ's decision); Gamer v. Secretary of Health and Human Services., 815

17   F.2d 1275, 1280 (9th Cir. 1987.  In addition, "[t]here must be a 'reasonable possibility that the new

18   evidence would have changed the outcome of" the ALJ's decision "had it been before him." Gamer, 815

19   F.2d 1275, 1280; Rice v. Apfel, 8 F.Supp.2d 769, 775 (N.D.Ill. 1998); Hangartner, 865 F.Supp. at 759

20   (materiality exists if decision might reasonably have been different if evidence had been presented to

21   ALJ).

22   As noted above, the Commissioner's regulations provide that additional evidence submitted for the

23   first time to, and also considered by, the Appeals Council becomes part of the "entire record." 20 C.F.R. §

24   416.1470(b); see also Penny v. Sullivan, 2 F.3d 953, 957 n. 7 (9th Cir. 1993); Nelson v. Sullivan, 966 F.2d

25   363, 366 (8th Cir.1992); Barbato v. Commissioner of Social Security Administration, 923 F.Supp. 1273

26   (C.D.Cal.,1996).  Where the Appeals Council considers the additional evidence, but declines to review the

27   case, the Court may review the ALJ's decision and determine whether substantial evidence in the record,

28   including that submitted to the Appeals Council, supports the ALJ's decision. Nelson, 966 F.2d at 366; see

also <u>Ramirez v. Shalala</u>, 8 F.3d 1449, 1454 (9th Cir. 1993).  If, on the other hand, the additional evidence is not considered by the Appeals Council, the Court may remand the case to the Commissioner, so long as the evidence is "new and material." <u>Nelson</u>, 966 F.2d at 366.

Defendant appears to argue that "good cause" for failing to submit the additional evidence earlier also must be shown before the Court may consider that evidence.  Clearly, good cause is required when new evidence is submitted for the first time to the Court. <u>See</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 462 (9th Cir. 2001).  The Ninth Circuit, however, specifically has stated that it has not yet decided whether that requirement applies to additional evidence submitted for the first time to, and considered by, the Appeals Council.[3] <u>Id.</u> at 461 n.3 (declining to overrule <u>Ramirez</u>).  The Court need not decide at this time whether good cause is required, because here the additional evidence has been submitted to, but not considered by the Appeals Council.  As noted above, the appropriate course of action when this happens is to remand the case to the Commissioner for consideration if the evidence is new and material.

As to plaintiff's claim that the Appeals Council failed to consider the documents her counsel faxed, as discussed above, the parties do not dispute that the Appeals Council received them.  Also as discussed above, the Appeals Council made no mention of those documents in its decision denying plaintiff's request for review.  The Appeals Council, however, did specifically mention and discuss the three letters discussed below that it was faxed on September 25, 2006.  Given that the Appeals Council addressed this evidence, but not the documents plaintiff's counsel faxed on November 15, 2006, the undersigned shall assume the Appeals Council failed to consider them.  That failure constitutes error, as does the failure to include them in the record, if the faxed documents are new and material.  The undersigned so finds.

The documents plaintiff's counsel faxed on November 15, 2006, are not merely cumulative of other evidence in the in the record.  Those documents consist of additional progress notes and other records from

---

[3]In <u>Mayes</u>, the Ninth Circuit did apply the "good cause" requirement in determining whether to remand to the ALJ for further consideration of additional evidence submitted for the first time to and considered by the Appeals Council. <u>Id.</u>  In doing so, however, the Court of Appeals expressly stated that there was no need to decide whether such a requirement applies to submissions to the Appeals Council, because the claimant in <u>Mayes</u> had conceded that she was required to show good cause. <u>Id.</u> at 461 n.3.  The Court of Appeals rejected a belated attempt by the claimant to assert that <u>Ramirez</u> and 20 C.F.R. § 404.970(b) "requires the Appeals Council to receive new evidence without regard to the issue of good cause," and that "good cause is required only when new evidence is submitted to a district court." <u>Id.</u>  In doing so, the Ninth Circuit noted that the claimant misapprehended <u>Ramirez</u>, in that the parties to that case had "agreed that the new evidence submitted for the first time to the Appeals Council should be considered," and thus <u>Ramirez</u> did "not address whether submissions to the Appeals Council are or are not subject to the good cause requirement. <u>Id.</u>

plaintiff's mental health counselors, none of which appear to previously have been included in the record. In addition, those progress notes and other records all date from the period of early July to early November 2006, a period of time the prior record largely did not cover.  Finally, these additional documents shed light on plaintiff's symptoms and ability to function during that period, and do not merely repeat the information contained in the mental health records to which the ALJ had access.

In terms of materiality, it seems clear that the additional documents have at least some relevance to plaintiff's condition during the period for which her benefits were denied.  The record shows plaintiff has had longstanding mental health issues, beginning as far back as early 1999, when she was hospitalized due to impaired mental status. See Tr. 410-11, 413-19; see also Tr. 328 (ALJ finding plaintiff's mental health symptoms seriously affected her functioning).  While, as discussed in greater detail below, the weight of the medical evidence in the record supports the ALJ's finding that when "compliant with her medications" plaintiff generally functions "at a fairly high level" (Tr. 328), other evidence indicates that increased stress could interfere with her ability to function, including to the extent that it might cause her to decompensate. See Tr. 189, 208, 225-26, 316-18, 447, 553.

Although most of the additional documents show that plaintiff functioned fairly well and remained stable from early July through late September 2006, it appears that she suffered a decompensation during the period of late October to early November 2006. (Dkt. #12, Appendix i, pp. 6, 13).  This appears to have been so, despite the fact that plaintiff seemingly continued to take her medications during this period. (See Dkt. #12, Appendix i).  The additional evidence thus shows that while it may be plaintiff in general is able to function at a fairly high level on her medications, her decreased ability to handle stress may cause her to decompensate, even years after her first and only such episode.  As such, the undersigned agrees that the documentation of plaintiff's late October to early November 2006 decompensation is further evidence that she is susceptible to stress, which could cause her to decompensate.

Viewed in this light, certainly there is a reasonable possibility that the ALJ's decision might have been different had the ALJ considered the additional evidence faxed to the Appeals Council on November 15, 2006.  Accordingly, the undersigned finds that evidence to be new and material evidence, which relates to the period on or before the date of the ALJ's decision, and which, pursuant to 20 C.F.R. § 416.1470(b), the Appeals Council was required to consider and include in the record.  The Appeals Council's failure to do so constitutes error.  As discussed above, the remedy that is available for this type of error is remand to

the Commissioner for consideration thereof in light of the entire record.  The undersigned thus finds that remand to the Commissioner for this purpose is appropriate here.

As to plaintiff's claim that the Appeals Council's failure to consider and include in the record the additional evidence discussed above violated her procedural due process rights, plaintiff fails to provide any argument to support that claim.  Nor has plaintiff made the kind of showing necessary to establish that whatever due process rights she claims to have here in fact have been violated.  It is true that "applicants for social security benefits are entitled to due process in the determination of their claims," including with respect to the administrative adjudication of those claims. Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001) (citing Richardson v. Perales, 402 U.S. 389, 398, 401-02 (1971)).  To establish what process is due, the following three factors must be addressed:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976); see also Boettcher v. Secretary of Health and Human Services, 759 F.2d 719, 722 (9th Cir. 1985).  Plaintiff, however, has utterly failed to address these factors, and the undersigned will not now do so for her.

B.      The Three Letters Faxed on September 15, 2006

Plaintiff claims plaintiff's counsel faxed three letters to the ALJ on September 25, 2006, four days before the ALJ issued his decision, which she asserts show her medical providers were concerned that if she attempted to work, it could result in decompensation.  Plaintiff further states that she then submitted those letters to the Appeals Council, which, as discussed above, issued a decision on November 20, 2006, declining to review the ALJ's decision.  She argues those letters provide further support for her claim that her mental impairments meet or equal the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03C ("Listing 12.03C").  As such, plaintiff asserts the Appeals Council's failure to reverse the ALJ's decision based on this additional evidence constitutes error.[4]

---

[4]Plaintiff also argues the ALJ failed to consider those letters.  It is true that no mention of them is contained in the decision. However, it is not at all clear that the ALJ actually received them.  Plaintiff herself acknowledges that this may have been the case, and the Appeals Council itself noted that the record did not contain them, and that it appeared they "were not in the file" at the time the ALJ issued his decision. Tr. 307.  The undersigned thus cannot fault the ALJ for having failed to consider evidence here to

REPORT AND RECOMMENDATION
Page - 8

1    Considered in light of the other additional evidence faxed to the Appeals Council on November 15,

2    2006, discussed above, the undersigned finds plaintiff has asserted a valid basis for remanding this matter

3    to the Commissioner for further consideration of the medical evidence in the record.  That is, as explained

4    in further detail below, in combination with the evidence showing plaintiff decompensated in late October

5    to early November 2006 and other evidence in the record, it is possible that the ALJ would find her mental

6    impairments met or equaled Listing 12.03C.

7    The undersigned declines to decide at this time, however, whether that evidence establishes Listing

8    level severity, however, because the three letters alone are insufficient to establish plaintiff should be

9    found disabled, and because it is inappropriate for the Court to determine whether she should be found

10   disabled based in whole or in part on the other additional documents submitted to the Appeals Council

11   before the Commissioner has first done so.  Indeed, as discussed above, judicial review sought for the

12   purpose of determining whether substantial evidence supports the ALJ's decision in light of additional

13   evidence that has been submitted to the Appeals Council is available only after the Appeals Council has

14   first considered that evidence, but then denied review. See Nelson, 966 F.2d at 366; Ramirez, 8 F.3d at

15   1454.  As such has not occurred here, the Court should refrain from making its own disability

16   determination.

17   II.    The ALJ's Step Two Analysis

18   At step two of the sequential disability evaluation process, the ALJ must determine if an

19   impairment is "severe." Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's

20   mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), (c); Social Security

21   Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes

22   necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85-28, 1985 WL 56856 *3.

23   An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

24   than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

25   Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

26   has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work

27   activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

28   which he appears to have had no access.

REPORT AND RECOMMENDATION
Page - 9

601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff's psychotic disorder, substance abuse disorder, obesity, as well as her residual problems from a remote motor vehicle accident, including a left hip injury and multiple fractures, to be severe impairments. Tr. 325.  In addition, with respect to the "multiple fractures" plaintiff sustained in the motor vehicle accident, the ALJ stated that she continued "to suffer some residual effects from those injuries, including extensive degenerative joint disease, cervical spine, sacral spine, pelvis, left hip, and left knee pain." Tr. 326.  Nevertheless, plaintiff asserts the ALJ failed to consider her degenerative joint disease and foot drop to be severe impairments.

In support of this assertion, plaintiff first points to certain clinical findings Louis Enkema, M.D., made during an examination of her in late November, 2005.  Plaintiff asserts Dr. Enkema found that she could not heel-to-toe walk due to her antalgic gait and apparent left foot drop.  What Dr. Enkema actually noted in his report, however, was that heel-to-toe walking was "not attempted" because of those conditions. Tr. 534.  Thus, it is unclear whether he actually felt she was unable to perform that task.  Dr. Enkema also made no statement with respect to how the ability to heel-to-toe walk, even if plaintiff could not perform that task, translated into specific work-related physical limitations.

It is true, as plaintiff states, that Dr. Enkema noted "[s]ome weakness" and "loss of motor function in the left lower extremity in the region of the ankle and foot with a marked reduction in ability to evert and dorsiflect that foot," and that he found a slight deformity in the left foot and slight atrophy in the left foot and ankle. Tr. 534-35.  It also is true that Dr. Enkema diagnosed her with "[e]xtensive degenerative joint disease, cervical spine, sacral spine, pelvis, left hip, left knee," and "[d]rop foot." Tr. 536.  Again, however, plaintiff does not explain how the above clinical findings and diagnoses translate into specific work-related limitations.  That is, mere diagnoses, the presence of lower extremity atrophy or deformity or, for example, the loss of motor function and/or reduction in ability to dorsiflect, without more, is insufficient to find that there has been more than a minimal effect on plaintiff's ability to work.

In any event, Dr. Enkema found plaintiff would be able to stand and walk for a total of six to seven hours in an eight-hour workday, indicating he felt she exhibited fairly minimal work-related limitations due to her physical impairments. Tr. 536.  Plaintiff points to Dr. Enkema's statement that she "possibly"

1   would benefit from an orthopedic device which "would prevent her from stumbling and falling

2   unnecessarily." Id.  However, in his functional assessment of plaintiff, Dr. Enkema found that "[n]o

3   assistive device" would be required.[5] Tr. 537.  In any event, given the above statement made by the ALJ

4   regarding the residual effects plaintiff suffered from her motor vehicle accident, including the ALJ's

5   specific reference to her "extensive degenerative joint disease," it seems the ALJ did at least find that

6   impairment to have more than a minimal effect on her ability to do work-related activities.

7         With respect to plaintiff's left foot drop, the weight of the medical evidence in the record fails to

8   clearly establish its severity, and, for that reason, the undersigned finds no error on the part of the ALJ in

9   not specifically determining it to be severe.  For example, in addition to the above lack of evidence from

10   Dr. Enkema's late November 2005 findings, although plaintiff was found to have "decreased range of

11   motion" in her left lower extremity by another examining physician back in late February of that year, she

12   was "able to walk without difficulty." Tr. 665.  Plaintiff also was noted to have only "a minor amount of

13   left foot drop," and she moved "all 4 extremities without difficulty otherwise." Id.

14         The record does contain findings from Joann Yost, a registered nurse who examined plaintiff on

15   several occasions, that contradict the above findings in certain respects. See Tr. 228-31, 236-37, 243-44,

16   250-51.  However, Ms. Yost's findings concern plaintiff's physical condition during the period from early

17   April 1999 to late June 2001, or more than four to six years earlier.  Thus, their relevancy in describing

18   plaintiff's condition at the time of the ALJ's decision is questionable.  In addition, the opinions of non-

19   acceptable medical sources, such as registered nurses, generally are entitled to less weight than those of

20   licensed physicians who are "acceptable medical sources." See Gomez v. Chater, 74 F.3d 967, 970-71 (9th

21   Cir. 1996); 20 C.F.R. § 416.913(a), (d).  Further, even Ms. Yost found at one point that plaintiff's left foot

22   drop problem was "now stable," and other than with respect to minor limitations regarding exercise, it was

23   "not a problem." Tr. 236.

24   III.     The ALJ's Step Three Analysis

25

26         [5]Plaintiff argues Dr. Enkema's opinion about plaintiff's functional limitations is inconsistent with his own objective clinical

27   findings. However, plaintiff fails to state what those inconsistencies are or how such inconsistencies adversely impact the credibility of Dr. Enkema's functional assessment. To the extent plaintiff is referring to Dr. Enkema's statement that plaintiff possibly would benefit from a orthopedic device and his subsequent conclusion that no assistive device was required, the undersigned finds no

28   inconsistency here.  That is, there is no inconsistency between stating on the one hand that a claimant could possibly benefit from such a device, but on the other hand noting that such a device was not required to function in a work setting.

1    At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's

2    impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P,

3    Appendix 1 (the "Listings"). 20 C.F.R. § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.

4    1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed

5    disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the

6    impairments in the Listings. Tacket, 180 F.3d at 1098.

7    A mental or physical impairment "must result from anatomical, physiological, or psychological

8    abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."

9    20 C.F.R. § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and

10   laboratory findings." Id.  An impairment meets a listed impairment "only when it manifests the specific

11   findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248

12   *2.  An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms,

13   signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

14   impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

15   Plaintiff argues the ALJ erred by failing to adequately explain why her mental impairments did not

16   meet or equal the "C" criteria[6] of Listing 12.03 (schizophrenic, paranoid and other psychotic disorders).  In

17   his step three analysis, the ALJ found in relevant part that there was "no evidence" plaintiff was "incapable

18   of functioning independently outside her home," and therefore "the 'C' criteria" were not met. Tr. 327.  In

19   doing so, however, plaintiff asserts the ALJ cited to the incorrect "C" criteria, instead referencing the "C"

20   criteria for Listing 12.06 (anxiety related disorders).  This mistake, plaintiff argues, constitutes reversible

21   error.  The undersigned disagrees.

22   While it does appear the ALJ referenced the incorrect "C" criteria, the undersigned finds this error

23   to be harmless. Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error

24   harmless where it is non-prejudicial to claimant or inconsequential or irrelevant to ALJ's ultimate

25   _____

26   [6]With respect to each mental disorder contained in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.00, section

27   12.00A states as follows: "Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the
listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations).
There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06 . . . We will assess the paragraph

28   B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B
criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph
and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."

disability conclusion).  Were this the only "C" criteria finding the ALJ made in his step three analysis,

plaintiff might be correct.  However, the ALJ went on to state in relevant part as follows:

> I therefore find that the claimant's mental health impairments fail to meet or medically
> equal the severity of any impairment listed in section 12.00 of the *Listing of
> Impairments*.

> My findings are generally consistent with the opinion of the state agency medical
> consultants with Disability Determination Services (DDS), who reviewed the record in
> connection with the initial stages and found that the claimant's mental health
> impairments did not meet the listings. *See* Ex B-3F [(Tr. 191-203)], B-5F [(Tr. 448-
> 56)]. . . . Because I find no objective evidence in the record to contradict the
> assessments in this case, I accord them considerable weight.

Tr. 327.  The state agency opinions to which the ALJ here referred are from Thomas Clifford, Ph.D., Anita

Peterson, Ph.D., and Lance Harris, Ph.D., none of whom found that plaintiff met the "C" criteria of Listing

12.03. See Tr. 202, 456.  The undersigned thus finds the ALJ did determine that none of plaintiff's mental

impairments met Listing 12.03C. See Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989) (district

court may draw specific and legitimate inferences from ALJ's opinion).

Plaintiff further argues, however, that in light of the additional evidence submitted to the Appeals

Council discussed above, the ALJ's step three determination is not supported by the substantial medical

evidence in the record.  The undersigned agrees that the additional evidence calls into question the validity

of that determination, and thus finds remand for further consideration of Listing 12.03C to be appropriate.

Listing 12.03 reads in relevant part as follows:

> 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders: Characterized by the
> onset of psychotic features with deterioration from a previous level of functioning.

> The required level of severity for these disorders is met . . . when the requirements in C
> are satisfied. . . .

> C. Medically documented history of a chronic schizophrenic, paranoid, or other
> psychotic disorder of at least 2 years' duration that has caused more than a minimal
> limitation of ability to do basic work activities, with symptoms or signs currently
> attenuated by medication or psychosocial support, and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or

> 2. A residual disease process that has resulted in such marginal adjustment that even a
> minimal increase in mental demands or change in the environment would be predicted
> to cause the individual to decompensate; or

> 3. Current history of 1 or more years' inability to function outside a highly supportive
> living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.

1   Plaintiff focuses on subsection 2 of Listing 12.03C, asserting the record contains ample evidence

2   showing she has "[a] residual disease process that has resulted in such marginal adjustment that even a

3   minimal increase in mental demands or change in the environment would be predicted to cause" her "to

4   decompensate."  As support for this assertion, plaintiff turns to the three letters discussed above that the

5   Appeals Council received from plaintiff's counsel, and that date from the latter half of 2004.  The first

6   such letter is dated August 19, 2004, and was written by Jan Kemmerer, A.R.N.P.  In that letter, Ms.

7   Kemmerer recommended that plaintiff "take a break from the Work First Program for the time being," as

8   there was "a strong possibility for decompensation" from "the added workload" of that program, given that

9   "[t]he recent birth of her child" had "caused an increase in stress." Tr. 316.

10   The next letter also comes from Ms. Kemmerer, dated September 22, 2004, in which she wrote it

11   was "evident" plaintiff "was struggling to cope with stresses" associated with having to "incorporate two

12   young children into her home," as well as care for her own infant, back in July of that year. Tr. 317, 553.

13   Ms. Kemmerer further expressed her concern about plaintiff's "continued ability to deal constructively"

14   with those stresses, and that if she attempted "to work at this time, or take on any additional activities

15   [such as involvement with the Work First Program], it could result in a decompensation and possibly even

16   the need for hospitalization." Id.  Ms. Kemmerer also felt that there was "a question" as to whether

17   plaintiff "should have a more permanent disability." Id.

18   In terms of the third letter, in early December 2004, Samantha Ritchie, M.D., echoed the concerns

19   of Ms. Kemmerer when she wrote that plaintiff was "handling her multiple responsibilities well," but she

20   believed that "if she also were forced to return to the work force, the stress would increase the chance of

21   another psychotic break." Tr. 318.  Plaintiff also points to a progress note provided by Ms. Kemmerer in

22   late January 2006, in which plaintiff had reported struggling "sometimes with low energy and feelings of

23   sadness," and in which she was assessed with a GAF score of 45-48. Tr. 659-60.  In addition, plaintiff

24   relies on her own testimony regarding her limited ability to handle stress and fear that any increase in her

25   stress could cause her to decompensate, and on the additional evidence submitted to the Appeals Council

26   indicating she "presented as very distraught and fearful" in late October 2006, and was assessed as having

27   decompensated in early November of that year. (See Dkt. #12, Appendix, pp. 6, 15).

28   As discussed above, however, there is no evidence in the record that the ALJ had access to the

1   three letters from Dr. Ritchie and Ms. Kemmerer when he issued his decision.  As such, he cannot be

2   faulted for not having considered them in making his step three determination.  In and of themselves,

3   furthermore, those letters present an insufficient basis on which to overturn the ALJ's decision, which was

4   based on his review of the entire period at issue.  Indeed, the medical evidence in the record that was

5   before the ALJ, including that provided by both Dr. Ritchie and Ms. Kemmerer, indicate that plaintiff,

6   with rare exceptions, was stable and functioned well for a number of years on her prescribed medication

7   prior to late 2004 (Tr. 165, 167, 169, 171-74, 175, 178-81, 184, 187, 203, 207-08, 225-26, 230, 235, 241,

8   244, 246, 248, 250, 255, 258, 262-66, 274, 277, 280-81, 283-84, 289, 293, 295-97, 436, 446-47, 449, 463,

9   465-66, 467, 469, 552-53, 606, 628-29, 648), and that she continued to do so for a long time thereafter (Tr.

10  317-18, 536, 540, 543, 568, 570, 572, 578-79, 586, 595-96, 639, 642, 646, 657, 659-61, 664-65).

11         On the other hand, in addition to the three letters discussed above, the record contains notes from

12  other medical sources who also noted plaintiff's limited tolerance for handling stress.  For example, Drs.

13  Peterson and Harris opined in mid-to-late 1999, that she tended "to be easily stressed," and that this likely

14  interfered "with her ability to sustain attention and concentration." Tr. 447.  In late August 2001, Sang H.

15  Suh, M.D., an examining physician, concluded in relevant part as follows:

16         I think that Melanie's prognosis is fair with antidepressant and antipsychotic
           medications, but her degree of stress tolerance still remains compromised and her

17         ability to maintain consistent and gainful employment would be markedly limited at
           this time, particularly because she is trying to go to school at this time.  Once she is

18         able to finish school and has a job that she enjoys doing, her prognosis might be quite
           good.  However, it is possible that her degree of stress tolerance is quite low and she

19         may have chronic bouts with depression and psychosis in the future without optimal
           treatment.  Her cognitive deficit is mild at this time, but when she does get sick it will

20         be severely limited.  Her ability to get along with coworkers, supervisors and the public
           will be mild [sic] to moderately limited.

21
    Tr. 189.

22
           In late October 2001, Thomas Clifford, Ph.D., a non-examining consulting psychologist, stated that

23
    "during periods of increased life stressors," plaintiff would "have occasional need for time off," though he

24
    also felt "[t]his would not be [at] an unacceptable or intolerable level." Tr. 208.  Dr. Clifford further

25
    opined that since she had "mildly increased symptoms when stressed, changes would require a little more

26
    time for her to adapt." Id.  While Dr. Clifford felt that those symptoms would not result in the need to

27
    receive extra supervision or "interfere significantly with most work activities," plaintiff would need to be

28
    provided with "a little more reassurance." Id.  In mid-November 2001, another non-examining consulting

REPORT AND RECOMMENDATION
Page - 15

1   medical source, Kristine Harrsion, Psy.D., commented that she had "limited stress tolerance" and

2   "difficulty with increased stress." Tr. 225.

3          This evidence, in combination with the three letters discussed above, show that there is support in

4   the record for plaintiff's argument that an increase in mental demands or changes in her environment could

5   cause her to decompensate.  Indeed, that plaintiff was diagnosed with an episode of decomensation in early

6   November 2006, less than three weeks prior to the Appeals Council's denial of her request for review,

7   even though it appeared that she had remained compliant with her medication regimen, lends further

8   credence to her argument.  Whether the record supports a finding that "even a minimal increase" in

9   plaintiff's mental demands or changes in the environment would cause her to decompensate, however, is

10  unclear.  For this reason, remand to the Commissioner for further consideration of this issue is appropriate.

11

12  IV.    The ALJ's Evaluation of the Medical Opinion Source Evidence in the Record

13         The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

14  medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

15  the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

16  of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

17  must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

18  Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

19  inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

20  "falls within this responsibility." Id. at 603.

21         In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

22  supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

23  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

24  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

25  evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

26  from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

27         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

28  either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A. Dr. Truschel

In early February 1999, Tim Truschel, M.D., diagnosed plaintiff with a schizophreniform disorder, without positive prognostic features, and a current GAF score of 20. Tr. 437-38.  This diagnosis, however, occurred soon after plaintiff's initial decompensation and hospitalization the previous month.  In addition, Dr. Truschel noted at the time that they were "gaining ground" on her condition and that things appeared to be "on the mend." Tr. 438.  Plaintiff complains that the ALJ did not mention these findings anywhere in his decision.  As pointed out by defendant, however, Dr. Truschel's findings related to plaintiff's closed period of disability, and thus was not relevant to her current application for benefits.

Plaintiff counters that Dr. Truschel, along with Ms. Kemmerer, opined in late September 2004, that if she attempted to work or take on additional activities, it could result in decompensation or the need for hospitalization.  The document plaintiff is referring to here is the September 22, 2004 letter written by Ms. Kemmerer and submitted to the Appeals Council. Tr. 317.  Because Dr. Truschel's name is written in at the bottom of that letter along with his signature, this would signify that he agreed with the statements and

1   findings contained therein.  As discussed above, however, the ALJ appears not to have had access to that

2   letter, and thus again cannot be faulted for not having considered it.  In addition, the undersigned already

3   has found that remand for further consideration of that letter along with the other medical evidence in the

4   record, including evidence of plaintiff's most recent decompensation, to be proper.

5        B.    <u>Dr. Krueger</u>

6        In early July 2001, Keith Krueger, Ph.D., completed a psychologic/psychiatric evaluation form, in

7   which he diagnosed plaintiff with a psychotic disorder, "still improving" with medication. Tr. 253.  Dr.

8   Krueger also found plaintiff to be moderately limited in her ability to: exercise judgment; make decisions;

9   relate appropriately to co-workers and supervisors; interact appropriately in public contacts; respond

10  appropriately to and tolerate the pressures and expectations of a normal work setting; control physical or

11  personal hygiene; and maintain appropriate behavior. Tr. 254.  The ALJ gave "little weight" to the above

12  moderate limitations, because there was "little to no basis" for them, further commenting as follows:

13         With regard to her cognitive functioning, he noted that the claimant had been helping
       her mother watch her 11-year old sister recently; did chores; and read up to 2 hours at a

14         time.  With regard to her social functioning, he noted that she did some in-home care
       but that it did not work out well and mentioned complaints regarding school, with no

15         time to study and physical demands. Ex B-115F/3.  These had nothing to do with the
       claimant's cognitive or social functioning and therefore show that the doctor had no

16         support for his assessments.

17  Tr. 331.  The undersigned finds the ALJ's determination here to be proper.

18       Plaintiff argues these were not legitimate reasons for rejecting Dr. Krueger's findings.

19  Specifically, plaintiff asserts those findings were based on the three prior evaluations Dr. Krueger did. <u>See</u>

20  Tr. 232-35, 238-41, 245-48.  Nowhere in his early July 2001 evaluation, however, did Dr. Krueger state or

21  otherwise indicate that this was the case.  Plaintiff further asserts Dr. Krueger noted that she had followed

22  through on his recommendation that she try to work part-time, that her part-time job did not work out, and

23  that she would continue to require mental health treatment.  The fact that plaintiff reported that she had

24  followed through on his recommendation that she try to work part-time does not in itself provide any

25  support for the moderate, or any other, limitations found by Dr. Kreuger.  While that part-time job may not

26  have worked out, furthermore, no explanation as to why it did not was not provided.  Finally, just because

27  plaintiff may require continuing mental health treatment does not mean she is functionally limited.  Indeed,

28  many people who receive such treatment are able to function quite capably in the work place.

1        C.      Dr. Suh

2            As noted above, in late August 2001, plaintiff was evaluated by Dr. Suh.  Plaintiff reported at that

3    time that she had been able to avoid hospitalizations "[o]ver the past couple of years" since early 1999,

4    when she was initially hospitalized, and had been "doing quite well" on medication. Tr. 187.  She also told

5    Dr. Suh that she had "not been seriously depressed" and denied "any history of mania." Tr. 187-88.  Dr.

6    Suh's mental status examination of plaintiff was fairly unremarkable. Tr. 188-89.  He diagnosed her with a

7    major depressive disorder with periodic psychosis, rule out schizoaffective disorder, and a current GAF

8    score of 60-70. Tr. 189.  Once more, in terms of prognosis Dr. Suh concluded as follows:

9            I think that Melanie's prognosis is fair with antidepressant and antipsychotic
             medications, but her degree of stress tolerance still remains compromised and her
10           ability to maintain consistent and gainful employment would be markedly limited at
             this time, particularly because she is trying to go to school at this time.  Once she is
11           able to finish school and has a job that she enjoys doing, her prognosis might be quite
             good.  However, it is possible that her degree of stress tolerance is quite low and she
12           may have chronic bouts with depression and psychosis in the future without optimal
             treatment.  Her cognitive deficit is mild at this time, but when she does get sick it will
13           be severely limited.  Her ability to get along with coworkers, supervisors and the public
             will be mild [sic] to moderately limited.  With respect to his capacity to manage funds,
14           I believe the claimant should be able to do so.

15   Tr. 189.

16           The ALJ gave Dr. Suh's assessment of plaintiff's functioning "very little weight," noting that his

17   "conclusions did not match his clinical findings nor the record as a whole," and that nothing in Dr. Suh's

18   evaluation, even including plaintiff's complaints, "supported his finding that she could not tolerate the

19   increased stress from employment." Tr. 330.  Plaintiff objects to the ALJ's determination here, asserting it

20   is factually incorrect and indicates a lack of understanding of the nature of mental illness.  Specifically, she

21   argues the ALJ failed to acknowledge that her medications have not cured her mental illness, that she must

22   take her medication to treat that illness, and that without her medication, she almost certainly would suffer

23   a serious, and possibly devastating, decompensation.

24           These facts alone, however, do not show that plaintiff cannot work or that her mental impairment

25   causes here significant work-related limitations.  That is, many people who suffer from mental illness and

26   who take medication therefor are still able to work.   Again, as noted by the ALJ, the record shows that as

27   long as plaintiff is compliant with taking her medication, she generally can function "at a fairly high

28   level." Tr. 328.  Plaintiff further argues that Dr. Suh did not claim it was inevitable she would

1    decompensate, but was justifiably concerned that "without optimal treatment," she could experience

2    serious problems with depression and psychosis in the future.  Once more, all this shows is that so long as

3    plaintiff complies with her prescribed medication and other recommended treatment, such problems will

4    not occur.

5           Similarly, it certainly may be that plaintiff developed an increase in her symptoms after her dosage

6    was decrease slightly in July 2003. Tr. 291.  It was reported in that very same progress note, however, that

7    after plaintiff's dosage quickly was increased, she began feeling better, and plaintiff herself related later

8    that month that she was not having any symptoms currently. Tr. 291, 628.  Nevertheless, the undersigned

9    finds that given the evidence in the record concerning plaintiff's issues with stress tolerance, including the

10   additional evidence submitted to the Appeals Council discussed above, this matter should be remanded to

11   the Commissioner for further consideration of Dr. Suh's opinion as well.

12          D.    Ms. Kemmerer

13          Plaintiff argues the ALJ failed to acknowledge that in late August and late September 2004, Jan

14   Kemmerer, A.R.N.P., wrote the two letters discussed above, in which she expressed her concern that if

15   plaintiff were to try to work, this could cause her to decompensate. Tr. 316-17.  Again, it appears that the

16   ALJ may not have had access to, and so may not have seen, these letters before he issued his decision, and

17   thus he cannot be faulted for not having considered or reviewed them.  Once more, however, those letters

18   and the other additional evidence submitted to the Appeals Council discussed above, as well as the other

19   evidence in the record concerning plaintiff's limited stress tolerance, indicate that her mental impairment

20   may cause greater limitations than found by the ALJ, and, therefore, this matter should be remanded to the

21   Commissioner for further consideration thereof.

22          Next, plaintiff argues the ALJ failed to acknowledge that on January 25, 2006, Ms. Kemmerer

23   noted she "struggles sometimes with low energy and feelings of sadness," and rated her with a current

24   GAF score of 45-48. Tr. 659-60.  The undersigned though does not see any error in such failure.  First, the

25   mere fact that plaintiff reported that she struggled at times with such symptoms does not mean that she was

26   significantly limited in terms of mental functioning thereby.  Indeed, plaintiff also reported at that time that

27   she had "generally been stable" over the past year, and that her medications worked "well" in terms of her

28   anxiety and "quite well" in keeping her psychotic symptoms in remission. Id.  As such, plaintiff has failed

1    to show the above self-report constitutes significant probative evidence.

2        The low GAF scores with which Ms. Kemmerer assessed plaintiff at the time also appear to be of

3    limited evidentiary value even just in the context of Ms. Kemmerer's own progress notes.  For example, in

4    the same evaluation, Ms. Kemmerer noted that plaintiff appeared "to be doing much better," and that

5    "[g]iven the stresses" she was dealing with, seemed "to cope remarkably well."  Tr. 660-61.  Less than two

6    months later, furthermore, Ms. Kemmerer reported plaintiff's mood as being "upbeat," with "no complaint

7    of psychiatric symptoms."  Tr. 657.  In addition, Ms. Kemmerer found plaintiff's schizoaffective disorder

8    to be in full sustained remission, and again noted that she appeared "to be doing quite well."  Id.

9        Lastly, plaintiff again brings up the issue of the episode of decompensation she was diagnosed with

10   in early November 2006, approximately one month after the ALJ issued his decision, as further support for

11   arguing the ALJ erred in evaluating Ms. Kemmerer's findings.  Once more, the ALJ cannot be faulted for

12   having failed to evaluate evidence to which he had no access.  As with Ms. Kemmerer's letters, however,

13   the most recent episode of decompensation warrants remand for further consideration of those letters and

14   the other evidence in the record concerning plaintiff's stress tolerance, whether she should be found to be

15   disabled at step three of the sequential disability evaluation process, and whether she in fact is more

16   limited in her ability to work than found by the ALJ.

17        E.    Ms. Yost

18        JoAnn Yost, A.R.N.P., completed a physical evaluation form in late June 2001, in which she found

19   plaintiff to be limited to sedentary work, due to musculoskeletal pain, including nerve damage in her left

20   leg, and left foot drop.  Tr. 250-51.  With respect to these findings, the ALJ found as follows:

21        I disagree with the assessment of the claimant's nurse practitioner, Joann [sic] Yost,
          ARNP, who found in June of 2001 that the claimant could perform sedentary work,
22        limited by left leg nerve damage.  Ex B-14/2.  There is no indication, other than her
          subjective complaints, in the record of significant neural damage.  *See* Ex B-21F/14, 10,
23        7.  Additionally, the claimant testified that she had not sought treatment for her left hip
          since 1998.  I agree that the residual effects of the claimant's motor vehicle accident
24        and obesity limit her physical abilities, but I further find that she is not limited to
          sedentary work, but can perform the demands of light work as noted above and as
25        found by the consultative examiner, Dr. Enkema.  *See* Ex B-18F/7-8.

26   Tr. 330.  Plaintiff argues the ALJ's findings are both incorrect and illegitimate.  The undersigned diagrees.

27        First, it must be noted that Ms. Yost, as a nurse practitioner, is not an "acceptable medical source"

28   as that term is defined in the Social Security Regulations, and therefore may be given less weight than

REPORT AND RECOMMENDATION
Page - 21

those of acceptable medical sources. <u>See</u> <u>Gomez v. Chater</u>, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 416.913(a), (d) (licensed physicians and licensed or certified psychologists are "acceptable medical sources").  Second, the opinions of such non-physician sources generally are treated in the same manner as testimony from lay witnesses. <u>See</u> 20 C.F.R. § 416.913(d) (Commissioner may use evidence from other sources to show severity of claimant's impairments and how those impairments affects his or her ability to work).  As such, in rejecting lay testimony, the ALJ need only give "arguably germane reasons" for doing so, as the ALJ did here. <u>Lewis v. Apfel</u>, 236 F.3d 503, 511-12 (9th Cir. 2001).

Plaintiff asserts that in rejecting Ms. Yost's findings, the ALJ disregarded those of Dr. Enkema, in which he found she had an antalgic gait, weakness and loss of motor function in her left lower extremity, abnormal reflex, extensive degenerative joint disease, and foot drop.  While Dr. Enkema may have made such findings (<u>see</u> Tr. 534, 536), they do not support Ms. Yost's limitation to sedentary work.  Indeed, as noted by the ALJ, Dr. Enkema essentially found her capable of performing at a minimum at the light level of work in his functional assessment (Tr. 536-37), a point which plaintiff does not address.  Accordingly, the undersigned finds no error here on the part of the ALJ.

V.    <u>The ALJ's Assessment of Plaintiff's Credibility</u>

Questions of credibility are solely within the control of the ALJ.  <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  <u>Allen</u>, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  <u>Id.</u> at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Id.</u>; <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Lester</u>, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. <u>O'Donnell v.</u>

1   Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

2       In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

3   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

4   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

5   also may consider a claimant's work record and observations of physicians and other third parties

6   regarding the nature, onset, duration, and frequency of symptoms. Id.

7       The ALJ discounted plaintiff's credibility in part on the basis that although plaintiff's psychiatric

8   symptoms "seriously affected her functioning" as claimed, it was "clear from the record" that when she

9   was "compliant with her medications," she functioned "at a fairly high level." Tr. 328.  This is a legitimate

10  reason for discounting a claimant's credibility. See Morgan v. Commissioner of Social Sec. Admin., 169

11  F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of medical improvement);

12  Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

13      Next, the ALJ noted that in terms of "physical complaints," plaintiff "rarely mentioned them to her

14  providers." Tr. 328.  Plaintiff argues this is not a convincing reason, because her physical problems were

15  stable, and there is no evidence in the record that they are amenable to treatment.  Plaintiff, however, has

16  argued that her physical limitations restrict her to sedentary work as found by Ms. Yost.  As such, it was

17  not unreasonable for the ALJ to assume to the extent plaintiff had significant work-related limitations, at

18  least some consistent mention of them be contained in the record.

19      In addition, the ALJ specifically noted that Dr. Enkema had concluded plaintiff was not nearly as

20  limited in terms of her work-related physical functional capacity as she now claims. Id.  This is yet another

21  valid reason for discounting her credibility. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th

22  Cir. 1998) (determination that claimant's complaints are inconsistent with clinical observations can satisfy

23  clear and convincing requirement).  The ALJ further noted other instances in which plaintiff's complaints

24  were inconsistent with the objective medical evidence in the record. See Tr. 328-29.

25      The ALJ also discounted plaintiff's credibility in part for the following reason:

26      The claimant testified that she slept well but took naps during the day.  The Appeals
        Council instructed me to address the claimant's complaint that her medications made

27      her sleepy.  I note that the claimant did not complain of this to her providers, which
        implies that the complaint was manufactured for purposes of this evaluation.

28
    Tr. 328.  Plaintiff objects to the ALJ's statement that she manufactured her complaint of sleepiness, and

argues that it is undisputable that a common side effect of one of her medications is drowsiness.  Even

assuming the undersigned were inclined to make such a general finding regarding that medication, which

she is not given the Court's lack of expertise in the area of medicine, the fact that one <u>possible</u> side effect

is sleepiness does not establish that such a side effect is present in <u>this</u> case.

Plaintiff points to her own testimony provided at the second hearing, in which she stated that her

medications made her very tired, and that she would fall asleep when she was doing her college internship.

With respect to the latter, plaintiff does not argue that she testified that she would fall asleep <u>because</u> of

medication side effects.  Even if this is what she is arguing, however, given that, as discussed herein, the

ALJ provided a sufficient number of valid reasons for discounting plaintiff's credibility, he would not be

remiss in failing to give her testimony on this issue much weight as well.

Plaintiff also argues Ms. Kemmerer reported in early August 2003, that she "[s]ounded somewhat

drowsy over the phone," and in early July 2004, that she felt "edgy and irritable," was "sleeping less well

at night," had "difficulty concentrating," and felt fatigued.  <u>See</u> Tr. 291, 552.  Again, however, plaintiff has

failed to show that such symptoms are due to side effects from her medication.  Indeed, these symptoms

just as likely could be due to a number of other causes.  Even if as with plaintiff's testimony regarding her

sleepiness, the meaning plaintiff imputes to Ms. Kemmerer's statements is applied here, and the evidence

in the record does not necessarily show she intentionally fabricated her complaints of sleepiness again the

ALJ provided other sufficient reasons for discounting plaintiff's credibility.

Lastly, the ALJ discounted plaintiff's credibility in part for the following reason:

> It appears clear that the claimant wishes to remain home to raise her children and
> therefore is pursuing Title 16 [SSI] benefits with that goal in mind. *See* Ex B-20F/59,
> 74.  In December of 2004, the claimant asked her new provider, R. Samantha Ritchie,
> M.D., to refer her to a neurologist to help with her SSI claim.  The doctor concluded
> that this was not warranted and would be "a waste of her time and the systems [sic]
> money." Ex B-21F/14.  I note that the reports from the claimant's case manager show
> that the claimant was stable without symptoms and functioning well.  She appeared
> fixated on getting SSI, apparently as an answer to her financial problems, and even
> stated that her attorney had never lost a case that he appealed to court. *See generally* Ex
> B-20F, B-19F.

Tr. 329.  Plaintiff argues this is not a valid basis for discounting her credibility, as the substantial evidence

in the record does not support such reasoning.  The undersigned agrees.

The ALJ may consider motivation and the issue of secondary gain in rejecting symptom testimony.

<u>See</u> <u>Tidwell v. Apfel</u>, 161 F.3d 599, 602 (9th Cir. 1998); <u>Matney on Behalf of Matney v. Sullivan</u>, 981 F.2d

1016, 1020 (9th Cir. 1992).  Here, however, there is little concrete evidence in the record that plaintiff was in fact motivated by secondary gain issues.  For example, Dr. Ritchie noted that an "SSI facilitator" at the Washington State Department of Social and Health Services recommended plaintiff go see a neurologist, and that plaintiff was "being pressured" to do so. Tr. 646.  In addition, while Dr. Ritchie did state she felt it would be a waste of time and money for her to do so, she did not accuse plaintiff of secondary gain or other similar behavior.  The undersigned further finds that while plaintiff certainly may have been preoccupied with financial concerns, not surprisingly given her situation, the record fails to show she was "fixated" on obtaining SSI benefits in the sense meant by the ALJ.

Nevertheless, the fact that some of the bases for discounting plaintiff's credibility was improper – e.g., the above findings regarding plaintiff's claims of sleepiness and issues with motivation and secondary gain – does not render the ALJ's credibility determination invalid, as long as it is supported by substantial evidence in the record, as it is overall in this case for the reasons set forth above. Tonapetyan, 242 F.3d at 1148.  The undersigned thus finds the ALJ's credibility determination overall to be proper.

VI.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

[T]he claimant has the residual functional capacity to lift and/or carry 20 pounds

occasionally and 10 pounds frequently, to sit and to stand and/or walk intermittently for a total of six hours in an eight hour workday, with no limitations with regard to pushing or pulling the above amounts. The claimant's exertional limitations allow her to perform "light" work under the regulations (20 C.F.R. § 416.967(b)[)]. Additionally, the claimant must avoid climbing ladders, ropes, or scaffolds. The claimant should have limited public contact and can perform detailed, but not complex, tasks.

Tr. 327. Plaintiff argues the ALJ erred in so assessing her by failing to properly consider the medical and other evidence from Dr. Truschel, Dr. Krueger, Dr. Suh, Ms. Kemmerer, and Ms. Yost, and in failing to properly consider her own testimony concerning her symptoms and limitations.

As discussed above, the ALJ did not err in evaluating the evidence from Dr. Truschel (except to the extent he agreed with the September 22, 2004 letter written by Ms. Kemmerer), Dr. Krueger and Ms. Yost. As such, the ALJ also did not err in assessing the above residual functional capacity on this basis. On the other hand, also as discussed above, the undersigned found it appropriate to remand this matter for further consideration of the opinions of Dr. Suh and Ms. Kemmerer in light of the additional evidence submitted to the Appeals Council and the other medical evidence in the record concerning plaintiff's limited ability to tolerate stress. As such, it is not clear that the ALJ's assessment of plaintiff's residual functional capacity includes all of her mental limitations. Further, because the ALJ's reasons for rejecting plaintiff's claims regarding her sleepiness and need to nap, on remand the Commissioner also shall reconsider whether she is unable to perform work on a regular and sustained basis due to that need.

Plaintiff, further argues that the ALJ failed to incorporate certain moderate limitations found by Dr. Clifford and Dr. Harrison into the above residual functional capacity assessment. The undersigned agrees, and on this basis as well, finds this matter should be remanded to the Commissioner for reconsideration of plaintiff's residual functional capacity. In mid-October 2001, Dr. Clifford found plaintiff to be moderately limited in her ability to: complete a normal workday and workweek; perform at a consistent pace; interact appropriately with the general public; and respond appropriately to changes in the work setting. Tr. 206-07. In mid-November 2006, Dr. Harrison found plaintiff had the same moderate mental functional limitations. Tr. 224-25. In his decision, the ALJ stated as follows:

My assessment is generally consistent with the opinions of the state agency medical consultants with Disability Determination Services (DDS), who reviewed the record in connection with the initial and reconsideration determinations. *See* Ex B-4F, B-6F. . . . Because I find no objective evidence in the record to contradict the assessments in this case, I accord them considerable weight.

Tr. 331.

The medical consultants to whom the ALJ referred above are respectively Dr. Clifford (Tr. 205-08) and Dr. Harrison (Tr. 223-26).  Plaintiff argues that although the ALJ stated he was giving their opinions "considerable weight," he failed to include the limitations contained therein in his assessment of her residual functional capacity.  Although the ALJ did appear to adopt their moderate limitation on interacting appropriately with the general public, he did not include the other three limitations or give any explanation as to why he did not do so, despite the considerable weight he stated he was giving the opinions of Drs. Clifford and Harrison.  As such, the ALJ erred in this regard too.

VII.    The ALJ's Step Five Analysis

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the most recent hearing, the ALJ posed a hypothetical question to the vocational expert, which included substantially similar limitations as those contained in the ALJ's assessment of plaintiff's residual functional capacity. Tr. 750.  In response to that question, the vocational expert testified that there were other jobs plaintiff could do. Tr. 751-53.  Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other work existing in significant numbers in the national economy. Tr. 332.

Plaintiff argues the ALJ did not include all of her limitations in the hypothetical question that was

posed to the vocational expert, including her need to nap during the day.  As discussed above, it is not clear that this latter limitation should have been excluded from plaintiff's residual functional capacity, and thus it also is unclear whether it should have been included in the hypothetical question.  Similarly, because the ALJ's evaluation of the evidence in the record from Dr. Suh and Ms. Kemmerer may not be supported by substantial evidence in light of Dr Suh's and Ms. Kemmerer's opinions and the additional evidence faxed to the Appeals Council, it cannot be said for certain that the hypothetical question the ALJ posed to the vocational expert contained all of plaintiff's mental limitations.

In addition, because the ALJ also erred in failing to include, or explain why he did not include, in his assessment of plaintiff's residual functional capacity the above moderate limitations found by Drs. Clifford and Harrison, it is not clear that those limitations properly were excluded from the hypothetical question.  As such, the ALJ erred here as well.  Accordingly, on remand, the Commissioner should re-consider plaintiff's ability to perform other jobs in significant numbers in the national economy at step five of the sequential disability evaluation process in light of the above discussion.

VIII.   This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain with respect to whether plaintiff's mental impairments meet or equal Listing 12.03C, with respect to plaintiff's residual mental functional capacity and with respect to her ability to perform

1  other work existing in significant numbers in the national economy, this matter should be remanded to the

2  Commissioner for further administrative proceedings.

3                                    CONCLUSION

4         Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

5  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

6  further administrative proceedings in accordance with the findings contained herein.

7         Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

8  the parties shall have ten (10) days from service of this Report and Recommendation to file written

9  objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

10 objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

11 imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **January 18,**

12 **2008**, as noted in the caption.

13        DATED this 20th day of December, 2007.

14

15

16                                    Karen L. Strombom
                                      United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 29